2019 UT App 52

## THE UTAH COURT OF APPEALS

CLEAN HARBORS ENVIRONMENTAL SERVICES AND
AMERICAN ZURICH INSURANCE CO.,
Petitioners,
*v.*
LABOR COMMISSION AND DAVID FOX,
Respondents.

Opinion
No. 20180448-CA
Filed April 4, 2019

Original Proceeding in this Court

Mark D. Dean and Kristy L. Bertelsen, Attorneys
for Petitioners

Scott F. Squire, Attorney for Respondent David Fox

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

HARRIS, Judge:

¶1 In administrative proceedings before the Labor Commission of Utah (the Commission), David Fox was awarded permanent total disability benefits due to a workplace injury. His employer, Clean Harbors Environmental Services (Clean Harbors), and its insurer, American Zurich Insurance Company, seek judicial review of the Commission's decision, and specifically challenge its refusal to exclude certain medical evidence. We conclude that the Commission did not abuse its discretion in considering the applicable medical evidence, and we therefore decline to disturb the Commission's ultimate decision to award benefits to Fox.

BACKGROUND

¶2 One day in August 2012, Fox's duties as an employee of Clean Harbors required him to clean hazardous material out of a large tank using a high-pressure hose. Even though Fox was dressed in a "haz-mat" suit and was wearing three pairs of gloves, he injured his right hand when he inadvertently turned on the hose while his hand was in front of the nozzle. The water, pressurized to 3,500 pounds per square inch, blasted into the palm of Fox's hand and base of his wrist. Fox was immediately taken to the hospital where a doctor (Doctor 1) performed surgery on him that night.

¶3 After surgery, Fox began physical therapy but, despite some improvement, over the next few months he continued to experience pain, numbness, and hypersensitivity to temperature in his hand, which prevented him from returning to work. In January 2014, Doctor 1 performed a second surgery on Fox, this time for carpal tunnel release, neuroma removal, and radial nerve repair. A few weeks later, at a post-operative follow-up appointment, Doctor 1 observed that Fox had "pain radiating up into the axilla, cold intolerance and swelling with increased hairiness," and eventually diagnosed Fox with Complex Regional Pain Syndrome (CRPS). Fox sought a second opinion from another doctor (Doctor 2), who also diagnosed Fox with CRPS, and opined that Fox's "CRPS is an extremely straightforward and classic example of CRPS—as straightforward of a case as [she had] ever seen." A few months later, Fox began treatment with yet another doctor (Doctor 3), who in September 2014 also diagnosed Fox with CRPS.

¶4 In an effort to ameliorate Fox's symptoms, Doctor 2 referred him to physical and occupational therapy, which he attended. In addition, Doctor 2 implanted a spinal cord stimulator into Fox's back in an attempt to help alleviate some of his pain. Although the implant was initially successful, after a

number of months it became infected and had to be removed and eventually re-implanted.

¶5 Over a year later, in December 2015, Clean Harbors sent Fox to a fourth doctor (Doctor 4). Although Doctor 4 concluded that, based on his injury, Fox qualified for either a partial upper-extremity or whole-person impairment rating, Doctor 4 also concluded that Fox did not have CRPS. In making her diagnosis, Doctor 4 relied upon the American Medical Association Guides, 5th Edition (the 2000 AMA Guides), a 2000 publication that contains standards for, among other things, the diagnosis of CRPS. Pursuant to those standards, an individual can be clinically diagnosed with CRPS only if he or she exhibits at least eight out of eleven specific objective symptoms, and Doctor 4 concluded that Fox exhibited only three of these symptoms.

¶6 In March 2016, Fox filed a permanent-total-disability claim for workers' compensation benefits, asserting that he had sustained injuries to his right hand while working for Clean Harbors. The matter proceeded to an evidentiary hearing before an administrative law judge (ALJ), and at that hearing both parties agreed that Fox's hand had been injured in the workplace accident, but they disagreed about the current condition of Fox's hand, specifically about his diagnosis of CRPS. In support of his claim, Fox submitted the medical opinions of Doctor 1, Doctor 2, and Doctor 3, all of whom had diagnosed him with CRPS. Conversely, Clean Harbors submitted Doctor 4's medical opinion that Fox did not have CRPS. After the hearing, the ALJ determined, among other things, that there was "a medical controversy regarding medical causation, functional restrictions, date of medical stability and recommended medical care," and ordered that these issues be referred to an impartial two-person medical panel (Panel) for consideration.

¶7 The Panel was comprised of two medical doctors, one a specialist in occupational medicine and the other a specialist in

pain management. After some legal wrangling that required the Panel to issue an amended report, it ultimately concluded that Fox has CRPS. To reach that diagnosis, the Panel did not use the 2000 AMA Guides or Utah's 2006 Impairment Guides (the 2006 Utah Guides), which refer to the 2000 AMA Guides; instead, the Panel used the more recent "Budapest Criteria" established by the International Association for the Study of Pain, which the ALJ found were "the most widely accepted diagnostic criteria among pain specialists." Under those criteria, an individual has CRPS if they exhibit symptoms in three out of four categories, and the Panel concluded that Fox's symptoms met those criteria. It stated that both the available medical records and its examination of Fox "strongly support[] the diagnosis of CRPS." The Panel concluded that Fox's condition—CRPS—was medically caused by the workplace accident.

¶8 Soon after the Panel issued its final report, Clean Harbors filed an objection, arguing that the ALJ should not adopt the report because the Panel did not use the diagnostic criteria found in the 2000 AMA Guides or the 2006 Utah Guides, which Clean Harbors maintained was required by a state regulatory provision contained in rule R612-300-9(A) of the Utah Administrative Code (the Rule). The ALJ rejected this argument, and concluded that the Rule required use of the 2000 AMA Guides only when "assessing an individual's impairment rating," something that was not at issue in this case. After refusing to exclude the Panel's report, the ALJ ultimately concluded that, "[b]ased upon a preponderance of the evidence," which evidence included not only the Panel's report but also the opinions of the other doctors, Fox did indeed suffer from CRPS, which was medically caused by the accident, and that Fox was therefore entitled to an award of permanent total disability compensation.

¶9 Clean Harbors appealed the ALJ's decision to the Commission, arguing that the ALJ erred in considering the

Panel's report, and asserting that the ALJ's Order should be reversed and a new medical panel convened to review the matter under the correct standard. After review, the Commission agreed with the ALJ that the Rule did not require exclusion of the Panel's report in this case, because "the [P]anel's diagnosis of CRPS was not rendered as part of an impairment rating but was the product of its impartial and expert review of [Fox's] condition and his medical history." The Commission stated that the Panel's report "represents a thorough and well-reasoned review of the medical aspects of [Fox's] case," and concluded that it was "persuaded by the [P]anel's conclusions because they are supported by the evidence in the record, including the opinions" of some of the other doctors.

## ISSUE AND STANDARD OF REVIEW

¶10 Clean Harbors now seeks judicial review of the Commission's determination, and specifically asks us to consider whether the Commission correctly determined that the Panel's report was admissible.[1] "We review the Commission's refusal to exclude a medical panel report or remand for an objection hearing under an abuse of discretion standard, providing relief only if a reasonable basis for that decision is not apparent from

---

1. In its brief, Clean Harbors phrased the issue in a slightly different manner, stating that the issue is whether the Commission erred "in determining that medical causation was met." At oral argument, however, it clarified that it was not intending to bring a sufficiency-of-the-evidence challenge to the Commission's ultimate determination of medical causation, a wise decision given that there was plenty of medical evidence—including but not limited to the Panel's report—to support a finding of medical causation in this case.

the record." *Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 8, 372 P.3d 44 (quotation simplified).

ANALYSIS

¶11    Clean Harbors's argument is premised entirely upon the application of the Rule. *See* Utah Admin. Code R612-300-9. Clean Harbors asserts that the Rule requires that any medical evaluation of whether Fox has CRPS be governed by the 2000 AMA Guides which, as noted, list eleven symptoms that are known to be associated with CRPS, and state that "[a]t least eight of these findings must be present concurrently for a diagnosis of CRPS." *See* Am. Med. Ass'n, *Guides to the Evaluation of Permanent Impairment* 496 (Linda Cocchiarella & Gunnar B.J. Andersson eds., 5th ed. 2000). No doctor has opined that Fox ever concurrently exhibited eight of the eleven symptoms listed in the 2000 AMA Guides and, for this reason, Clean Harbors takes the position that Fox was inaccurately diagnosed with CRPS, and that the Commission should not have considered the Panel's report.

¶12    For his part, Fox maintains that the CRPS diagnostic criteria set forth in the 2000 AMA Guides have been superseded in the medical literature by the "Budapest Criteria," which Doctor 2 stated were adopted in 2010 by the International Association for the Study of Pain. Fox asserts that the medical professionals—including the medical panel—who examined him and diagnosed him with CRPS were following the most current standard of medical care, which requires that a patient exhibit symptoms in three of four areas, diagnostic criteria that he clearly meets. Further, he asserts that the Rule upon which Clean Harbors relies is inapplicable here, because that Rule is, by its terms, limited to cases in which impairment ratings are at issue, and notes that no such rating was at issue in this case. In our view, Fox has the better of the arguments.

¶13 "We review administrative rules in the same manner as statutes, focusing first on the plain language of the rule." *Utah Chapter of the Sierra Club v. Air Quality Board*, 2009 UT 76, ¶ 13, 226 P.3d 719. "In our inquiry, we seek to give effect to the intent of the body that promulgated the rule." *Burns v. Boyden*, 2006 UT 14, ¶ 19, 133 P.3d 370. But "an agency's rules must be consistent with its governing statutes," and we therefore look to both the rules and the governing statutes and construe the rule "together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason." *Newspaper Agency Corp. v. Department of Workforce Services*, 1999 UT App 222, ¶ 12, 984 P.2d 399 (quotation simplified). Accordingly, as we do with questions of statutory interpretation, we begin our evaluation of the Rule with an examination of the Rule's text. *See Sierra Club*, 2009 UT 76, ¶¶ 37–38 (looking to the "plain language" of a regulatory provision); *see also Craig v. Provo City*, 2016 UT 40, ¶ 33, 389 P.3d 423 (interpreting a statute beginning with its text).

¶14 According to its title,[2] the Rule governs "Permanent Impairment Ratings," and its text instructs tribunals, when "rat[ing] a permanent impairment," to first consult Utah Code section 34A-2-412, which contains a list of some permanent impairment ratings. *See* Utah Admin. Code R612-300-9(A). If section 34A-2-412 does not provide an impairment rating for the

---

2. We recognize that "the title of a statute is not part of the text of a statute, and absent ambiguity, it is generally not used to determine a statute's intent." *Blaisdell v. Dentrix Dental Sys., Inc.*, 2012 UT 37, ¶ 10, 284 P.3d 616 (quotation simplified). However, the title of a statute "is persuasive and can aid in ascertaining the statute's correct interpretation and application." *Id.* (quotation simplified). Although we do not find the text of the Rule ambiguous, we mention the title here because it is entirely consistent with the plain meaning of the text.

condition at issue, then the Rule instructs tribunals to look next to the 2006 Utah Guides "to rate a permanent impairment." *Id.* (stating that the 2006 Utah Guides "are to be used to rate a permanent impairment not expressly listed in Section 34A-2-412"). Finally, if the 2006 Utah Guides fail to supply the answer, the Rule instructs tribunals that "impairment ratings are to be established according to the" 2000 AMA Guides. *Id.* R612-300-9(B). Fox correctly points out that the Rule, by its explicit terms, is limited in its application to proceedings establishing "impairment ratings." Nothing in the Rule indicates any application to proceedings not involving the establishment of an impairment rating, and we are reluctant to read such language into the Rule, not only because such a reading would be contrary to plain language principles of interpretation, *see I.M.L. v. State*, 2002 UT 110, ¶ 25, 61 P.3d 1038, but also because workers' compensation statutes and regulations are to be construed "liberally in favor of finding employee coverage," *Olsen v. Samuel McIntyre Inv. Co.*, 956 P.2d 257, 260 (Utah 1998); *see also Newspaper Agency Corp.*, 1999 UT App 222, ¶ 12 (stating that "an agency's rules must be consistent with its governing statutes," and "rules made in the exercise of a power delegated by the statute should be construed together with the statute to make, if possible, an effectual piece of legislation in harmony with common sense and sound reason" (quotation simplified)).

¶15    The proceeding before the ALJ and the Commission was not a proceeding to establish an impairment rating. When Clean Harbors argued, to the Commission, that the Rule required application of the 2000 AMA Guides in this case, the Commission rejected the argument, noting that it was "unaware of any precedent for using [the 2000 AMA Guides] to reject a medical panel's general diagnosis," and that "the panel's diagnosis of CRPS was not rendered as part of an impairment rating but was the product of its impartial and expert review of Mr. Fox's condition and his medical history." The Commission succinctly concluded that "the medical panel was not required to

apply the standards contained in the impairment guides in order to assess Mr. Fox with CRPS as a result of the work accident."

¶16   Clean Harbors resists this conclusion, and the limiting nature of the plain language of the Rule, by first asserting that the 2006 Utah Guides and the 2000 AMA Guides have "been adopted by the Commission generally for diagnostic criteria." Although it cites no authority to support this proposition, Clean Harbors reasons that the Commission should, for the sake of consistency, apply the same standard to both impairment ratings and diagnostic conclusions. We reject this argument because, while consistency may be a laudable goal in the abstract, it does not give us license to ignore the plain language of the Rule. And the Rule by its express terms is limited in its application to proceedings in which the establishment of an impairment rating is sought.[3]

---

3. Given the nature of this case, neither party has occasion to challenge the Rule's mandate—in 2019—that nineteen-year-old diagnostic standards be applied to Labor Commission cases that do involve the establishment of a permanent impairment rating. While there may be some areas of medicine in which not much has changed in two decades from a diagnostic standpoint—after all, a broken arm is a broken arm—we pause to wonder about the wisdom of a state administrative agency attempting to tell medical professionals how to diagnose medical conditions at all, let alone mandating the use of date-anchored and therefore potentially-outdated diagnostic criteria across the medical spectrum. In this case, three doctors plus a medical panel definitively diagnosed Fox with CRPS, using diagnostic criteria they deemed to be consistent with current medical science. One of those doctors—Doctor 2—seemed especially exercised about potentially being told by administrative rulemakers how to diagnose her patients, and included the following extraordinary

(continued…)

(…continued)

comments in a progress note in her medical record of one of Fox's visits:

> In reviewing [the 2006 Utah Guides] it does not appear that significant effort or expertise was expended in developing these guidelines, not the least because *the name of the diagnosis is incorrect in multiple locations* . . . . The "extensive review" cited by Barth is a 14-year-old opinion article published in the AMA Newsletter. . . . Additionally the comments on the "overlap of the diagnosis of CRPS and the Pain Disorders as listed under the somatoform disorders" [are] inappropriate in implying that CRPS is psychogenic or that patients with CRPS do not have a "legitimate" medical condition—rather there are very specific, objective, diagnostic findings and criteria for CRPS. Taken as a whole this Guide appears unscientific and rather prejudiced against patients with CRPS.
>
> . . . .
>
> Additionally the recommendation in the [2000 AMA Guides] to have eight (!) signs of CRPS present at the time of examination is bizarre.
>
> . . . .
>
> There is an utter absence of evidence to support [the 2000 AMA Guides'] list of symptoms and a requirement of 8 of them to be present at the time of evaluation as somehow confirming the diagnosis of CRPS . . . . I can only surmise that this list comes from very old, very outdated information. In 2010 the International Association for the Study of Pain (IASP) published updated diagnostic criteria for [CRPS]—the so-called Budapest Criteria. These criteria have been validated with a sensitivity of

(continued…)

¶17    Second, Clean Harbors points to a line in the 2006 Utah Guides, wherein it is "recommend[ed] that for the diagnosis of CRPS to be given, it must first meet the criteria as described in the [2000 AMA Guides]." Utah Labor Comm'n, *Utah Labor Commission's Supplemental 2006 Impairment Rating Guides* § 2.1(a) (Alan L. Colledge ed., 2006). But a mere "recommendation" by the committee that compiled the 2006 Utah Guides cannot

---

(…continued)

> 99% and specificity of 79%. They are considered
> the definitive diagnostic criteria and should be the
> ONLY criteria used to diagnose CRPS.

If these comments are at all representative of the medical community's collective feeling about the Rule, it might be time for its reexamination. In any event, we leave for another day the question of whether, in a case that actually involves establishment of an impairment rating, the Rule's apparent limitation on recovery—where current medical science concludes that injury is present, but the Rule compels a contrary conclusion by mandating reliance on outdated diagnostic standards—would be inconsistent with statutory mandates that injured workers be compensated for medical conditions caused by workplace injuries, *see* Utah Code Ann. § 34A-2-401(1) (LexisNexis 2015) (stating that workers injured in a workplace accident "shall be paid . . . compensation for [the] loss sustained"), and that the Commission adopt scientifically sound protocols, *see id.* § 34A-2-407.5 (stating that the Commission may adopt "reasonable health care treatment protocols, that include determinations of medical necessity, and medical treatment and quality care guidelines that are: (a) scientifically based; (b) peer reviewed; and (c) consistent with any general standards for health care treatment protocols that the commission establishes by rule"), as well as with the longstanding principle that workers' compensation statutes be construed "liberally in favor of finding employee coverage," *see Olsen v. Samuel McIntyre Inv. Co.*, 956 P.2d 257, 260 (Utah 1998).

eclipse the plain language of the applicable Rule. Indeed, as noted, the Rule does not require the use of the 2000 AMA Guides for general diagnostic purposes, and Clean Harbors provides no other authority for the proposition that such a recommendation is entitled to binding effect on the Commission.

¶18   Having concluded that the Rule does not mandate exclusion of the Panel's report, we next examine whether there was any other basis on which the Panel's report should have been excluded. In Utah, workers injured by an industrial "accident arising out of and in the course of" their employment are entitled to workers' compensation benefits. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2015). This statute requires injured workers to prove, among other things, medical causation, meaning that "the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 12, 317 P.3d 464 (quotation simplified). When considering whether to award workers' compensation benefits, an ALJ must refer "significant medical issues," such as "[c]onflicting medical opinions related to causation of the injury or disease," to an independent medical panel. Utah Admin. Code R602-2-2(A). The panel must then evaluate the medical evidence and complete a report advising the ALJ as to the medical issues, *see* Utah Code Ann. § 34A-2-601, which report the ALJ has "discretion to adopt or reject . . . on the basis of the evidence developed in the case," *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 23, 428 P.3d 26.

¶19   Under applicable statutes, there are "three potential scenarios in which a medical panel report can be admitted into evidence." *Johnston v. Labor Comm'n*, 2013 UT App 179, ¶ 26, 307 P.3d 615 (citing Utah Code Ann. § 34A-2-601). "The first is where no objection to the medical report is made and the report is admitted into evidence." *Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 10, 372 P.3d 44 (quotation simplified). "The second occurs when an objection to the medical panel report is timely

filed and the [ALJ] convenes a hearing on the objection," after which the report may be considered as evidence only if it is "sustained by the testimony admitted." *Id.* (quotation simplified). The third, although not directly addressed in the statute, occurs "when an objection to the report is timely filed but the [ALJ] elects not to hold an objection hearing." *Id.* (quotation simplified). In this scenario, the ALJ's decision is proper if she "properly exercised her discretion in denying a hearing" and if the objection to the medical panel report was not well taken. *Id.* (quotation simplified).

¶20   In this case, the ALJ did not abuse her discretion in denying a hearing, because Clean Harbors's sole objection to the medical panel report was not well taken. Although Clean Harbors objected to the admission of the Panel's report, that objection was based entirely upon its argument regarding application of the Rule, which the ALJ properly rejected for the reasons we have articulated above. Thus, we perceive no abuse of discretion on the part of the the ALJ both in denying Clean Harbor's request for a hearing and in overruling its objection to the Panel's report, and no abuse of discretion by the Commission in considering the Panel's report.

¶21   The task facing the Commission in this case was to determine whether Fox's accident resulted in CRPS. To qualify for compensation, Fox was required to show that his accident was both the legal and medical cause of his injury. *See Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 16, 378 P.3d 1273. "Medical causation is fundamentally a factual determination." *Id.* ¶ 23. And the purpose of a medical panel report is to "evaluate [the] medical evidence and advise an [ALJ] with respect to the [ALJ's] ultimate fact-finding responsibility." *Id.* (quotation simplified). However, the Commission is not required to adopt the findings of a medical panel's report "if other substantial conflicting evidence in the case supports a contrary finding." Utah Code Ann. § 34A-2-601(2)(e)(ii). Indeed, it is ultimately "the

prerogative and the duty of the Commission" to consider both the panel's report and "all of the other evidence" when deciding causation. *Bade-Brown*, 2016 UT App 65, ¶ 13 (quotation simplified).

¶22    Here, the Commission examined the Panel's report and determined that it was proper to adopt its findings. The Panel in this case was comprised of two qualified physicians who examined Fox and properly considered the reports of his examining physicians in light of "the most widely accepted diagnostic criteria among pain specialists." Its conclusion that Fox suffered CRPS as a result of the accident was well-reasoned and highly probative. We perceive no reason why the Commission should not have considered and adopted the Panel's report.

CONCLUSION

¶23    While the Rule might—perhaps unwisely—require medical professionals to utilize outdated diagnostic standards when establishing an impairment rating, the Rule by its terms applies only to proceedings to establish a permanent impairment rating. Such a rating was not at issue in this case, and we decline Clean Harbors's invitation to read into the Rule a broader requirement that might prevent medical professionals, when diagnosing their patients outside the context of establishing an impairment rating, from utilizing current medical diagnostic standards. Accordingly, the Commission did not err by considering the Panel's report. We therefore decline to disturb its conclusions.

_____