2025 UT App 98

# THE UTAH COURT OF APPEALS

GLOBE CONTRACTING LLC,
Appellee,
*v.*
RAYMOND R. HOUR, KIMBERLY TAING, HOUR TAING ENTERPRISE
LLC, AND HOUR CHIROPRACTIC CLINIC INC.,
Appellants.

Opinion
No. 20240058-CA
Filed July 3, 2025

Third District Court, Salt Lake Department
The Honorable Coral Sanchez
No. 170900003

Jeffrey T. Colemere, Tamara J. Hauge, and
Emily Adams, Attorneys for Appellants

Benjamin S. Ruesch, Tony G. Jones,
Travis Dunsmoor, and Jeannette Barney,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1 Dr. Raymond Hour and Globe Contracting LLC (Globe) entered into a contract in which Globe agreed to construct an office building for Hour's chiropractic clinic. After Hour failed to make the last three payments that were due under the contract, Globe sued, raising several causes of action relating to breach of contract. Hour counterclaimed, asserting that Globe had breached the contract first—and, as a result, that Hour had been justified in not continuing to pay Globe for its work. At the close of a bench trial, the district court ruled that Hour had breached the contract and that he had no justification for doing so. In its findings of fact

and conclusions of law, the district court awarded Globe damages. And after several months of posttrial litigation, the court ordered Hour to pay prejudgment interest, costs, and attorney fees.

¶2 Hour raises several issues on appeal. For the reasons set forth below, we rule as follows:

- First, we affirm the district court's determinations that Hour was liable for breach of contract (and the other associated claims).

- Second, we affirm the district court's calculation of Globe's damages.

- Third, we reverse the district court's awards of prejudgment interest and costs to Globe, and we remand for further proceedings on those awards.

- Finally, we reverse the district court's award of attorney fees to Globe, and we remand for further proceedings on that award.

BACKGROUND[1]

*Contract and Dispute*

¶3 Hour is a chiropractor, and Globe is a licensed general contractor. In October 2015, Hour and Globe agreed to a contract under which Globe would construct an office building for Hour's

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only as necessary to understand the issues on appeal." *Bountiful City v. Sisch*, 2023 UT App 141, n.1, 540 P.3d 1164 (quotation simplified).

chiropractic clinic. Under the terms of the contract, Hour was to pay Globe $650,000 "subject to additions and deductions for written change orders." Hour was required to pay Globe through monthly "progress payments" that were due 30 days after Globe sent Hour an application for payment, and Globe's applications for payment were to be sent "on or before the 30th day of each month for labor and materials delivered to the jobsite during the month."

¶4    The contract stated that the monthly progress payments could be "withheld" under four delineated circumstances:

> 1. Work is found defective and not remedied;
>
> 2. [Globe] does not make prompt and proper payments to subcontractor;
>
> 3. [Globe] does not make prompt and proper payments for labor, materials, or equipment furnished;
>
> 4. Another contractor is damaged by an act for which [Globe] is responsible.

¶5    The contract provided that construction was to "begin within seven (7) days after issuance of building permit," that work was to "be substantially completed two-hundred and ten (210) days after issuance of building permit," and that "[a]ny request for additional days [was to] be treated as a request for a change order, and must be in writing before it will be considered by" Hour. The contract further provided that the "times stated in" the contract could be "extended by a change order" by Hour or when Globe was "delayed in work progress by changes ordered, . . . weather, . . . or other causes beyond [Globe's] control or which justif[ied] the delay."

¶6      The contract also stated that if Globe "default[ed] in performances of any provision" from the contract "or fail[ed] to carry out the construction in accordance with the provision of the contract documents," Hour was entitled to "terminate" the contract "on thirty (30) days written notice to" Globe, or to instead not terminate the contract but "make good the deficiency of which the default consists, and deduct the cost from the progress payment then or to become due to" Globe. Finally, the contract contained an attorney fee provision, which stated that if "any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called on to pay, a reasonable sum for the successful party's attorney fees."

¶7      The city issued a building permit on December 1, 2015. As a result, a construction expert later testified at trial (and no party has disputed on appeal) that, under the contract's 210-day provision, construction was expected to begin on December 7, 2015, and be "substantially completed" by July 5, 2016. In late 2015 and early 2016, however, there were construction delays caused by "abnormally cold weather," "rain fall and subsequent mud," and the discovery of "[c]oncealed debris" on the building site.

¶8      On June 7, 2016, Hour, through his attorney, sent a letter to Globe stating that "as of this time, it is apparent that there is no way the work can be completed by [the required] date." Hour informed Globe that he was giving "notice pursuant to the contract that [Globe was] in default" and that he was also giving "30 days notice of his termination of the contract." On July 18, 2016, Hour's attorney sent another letter to Globe stating that because "the building [was] not substantially completed within two hundred and ten days as required" by the contract, Globe was "in default" and the contract was "no longer binding on . . . Hour."

¶9      But although these letters spoke of "termination," Hour later informed Globe that he would give it "till the end of

September" to complete the project.[2] Moreover, during construction, "Hour initiated 24 changes" to the project, "most of which were substantial changes that affected the finished portions of construction and were initiated after the date of Hour's 30-day notice to terminate" the contract "for lack of progress," and at least some of which were requested after the July 2016 letter.

¶10    Hour made timely payments for the first seven progress payments, the seventh of which was linked to the June pay application. But Hour did not make the eighth, ninth, or tenth progress payments, which were due, respectively, at the end of August, September, and October. Even though Hour stopped paying, Globe continued with its construction work until the end of September 2016.

¶11    On September 22, 2016, Hour notified Globe that he was dissatisfied with the quality of the workmanship. On September 28, 2016, Hour terminated the contract. As of September 28, however, both Hour and a new contractor that he had hired to take over the project believed that the project "was substantially complete." The next day, the city performed a "scheduled" inspection for temporary occupancy. The building did not pass the inspection because, among other reasons, the stairwell doors were not fire rated.

*Complaint, Counterclaim, and Pretrial Litigation*

¶12    In January 2017, Globe sued Hour, asserting a number of claims. Those relevant to this appeal were claims for breach of contract, breach of warranty, unjust enrichment, lien foreclosure, breach of implied covenant of good faith and fair dealing, and

---

2. Hour has taken a similar view on appeal, agreeing that, after the June and July letters, he "gave Globe an additional three months—until September 2016—to finish" the project, and further asserting that he finally "terminated" the contract on September 28, 2016.

intentional interference with contractual relations. In connection with these claims, Globe requested damages, prejudgment and postjudgment interest, and attorney fees. Globe filed the complaint in the Third District Court, and it originally did so pro se. A few months after Globe filed its complaint, attorneys who were based in southern Utah filed a notice of appearance, and those attorneys represented Globe throughout the ensuing several years of litigation (and have continued to do so up through this appeal).[3]

¶13 Hour filed an answer that included a counterclaim against Globe. In his answer, Hour asserted that he was justified in not paying Globe—indeed, for even "terminat[ing] . . . the contract"—because Globe itself had committed "material breaches of the contract." Hour elaborated on these assertions in his counterclaim, alleging there that Globe had breached the contract by, among other things, "failing to complete the work on the project within 210 days[] without good cause," performing substandard and defective work, "hiring subcontractors who were not licensed to do the work and/or not qualified for the work they were hired" to do, and "failing to pay several of its subcontractors who worked on the project."

---

3. Under settled principles, a corporation is not entitled to "self-representation because corporations are artificial entities that are not allowed to represent themselves in court." *Hartford Leasing Corp. v. State*, 888 P.2d 694, 700 (Utah Ct. App. 1994); *see also Tracy-Burke Assocs. v. Department of Emp. Sec.*, 699 P.2d 687, 688 (Utah 1985) ("It has long been the law of this jurisdiction that a corporate litigant must be represented in court by a licensed attorney."); *CoBon Energy, LLC v. AGTC, Inc.*, 2011 UT App 330, ¶ 9 n.1, 264 P.3d 219. But Globe's initial violation of this rule seems to have been cured in short order.

¶14   After a series of pretrial rulings, the case went to a bench trial on the claims and counterclaims listed above.[4]

¶15   At the close of discovery, and pursuant to court order, the parties submitted direct examinations of their witnesses in written form in early March 2020. Trial was scheduled to occur at the end of March 2020, but it was delayed for nearly three years due to the COVID-19 pandemic. A several-day bench trial was eventually held in February and March 2023, at which time the parties were able to cross-examine and then examine, on redirect, the witnesses

---

4. By way of background, there were several additional parties and claims that did not make it to trial. These included the following:

- Along with Globe, two individuals—Matthew Barlow and Damir Alijagic—were listed as plaintiffs on the complaint. Before trial, the district court dismissed all of the claims asserted by Barlow and Alijagic in their individual capacities.
- In addition to suing Hour, the plaintiffs sued Kimberly Taing, Hour Taing Enterprise LLC, and Hour Chiropractic Clinic Inc. With one exception, the district court dismissed all of the claims against these additional defendants before trial. The exception was the unjust enrichment claim, which proceeded to trial against all of the defendants.
- Finally, this case was initially consolidated with a separate construction lien case between Hour and Globe that also involved one of Globe's subcontractors. Before trial, the district court granted summary judgment on behalf of Globe, and no party has challenged that ruling in this appeal.

Although the case involved, at various times, the additional parties we've just identified, the parties on appeal have consistently referred to the two sides as "Globe" and "Hour." We'll follow suit throughout this opinion.

whose direct examinations had been submitted years earlier in written form.

¶16 As part of its submissions in 2020, Globe submitted a direct examination of Matthew Barlow, who was Globe's president and a managing member.[5] In that written examination, Barlow stated that he had previously filed a construction lien on the project for $55,533.17, and that, at the time, Globe seemed to have intended for this to reflect the amount that Globe believed that Hour still owed to Globe. Before trial resumed in 2023, however, Globe submitted a damages exhibit that requested $61,901.92 in damages. During a hearing, Hour's counsel explained that the two sides had "talked about" certain "change orders" and had accordingly "changed" certain numbers by way of "stipulation[]." In a posttrial filing, Globe explained that while it had been preparing for the 2023 trial, it had become aware of "certain change orders that were either undisputed or not properly accounted for" in the earlier estimate of damages, thus resulting in the change.

*Trial and Ruling*

¶17 As indicated, the district court heard several days of testimony in the spring of 2023. The court subsequently issued findings of fact and conclusions of law. There, the court concluded that Hour had breached the contract by "withholding payment on the July 2016, August 2016, and September 2016 pay applications." The court further concluded that this was a "material breach," reasoning that in "construction contracts, no other breach is more material to contractors than the unjustified nonpayment to contractors and suppliers."

¶18 The court then concluded that Hour's nonpayments were "not justified under the [c]ontract or Utah law." At trial, Hour's

---

5. As noted, Barlow was originally listed as a plaintiff, but the court dismissed his individual claims before trial.

principal contention was that, as of July 2016, he was justified in not paying because of Globe's delays. But the court rejected this contention for two main reasons. First, the court noted that the contract had set forth four reasons that would allow Hour to withhold payments but that delays were not one of them, and the court saw no other provision in the contract that allowed him to "withhold payment due to time delay." And the court declined to infer that time was of the essence for purposes of this contract given that, among other things, there was no "time is of the essence" provision in the contract, and because, until the June 2016 letter, "Hour had not communicated to Globe that it was imperative for the work to be substantially completed within 210 days." Second, the court also held that, even if timeliness could be viewed as a material requirement under the contract, the delays that had occurred at the time that Hour stopped paying were attributable to both weather and "change orders by Hour," those delays "were not the fault of Globe," and "the date of substantial completion was extended to November 29, 2016"—which was well past the point at which Hour had breached the contract by stopping his payments.

¶19    The court also addressed Hour's contention that he was justified in no longer paying because of defects in Globe's workmanship. The court specifically found that the workmanship issues Hour pointed to at trial did not actually "arise until September 22, 2016, months after Hour decided to withhold payment," that Hour had not notified Globe of his complaints until September 22, and that Hour believed the project "was substantially complete by September 28." The court further found that, even if the alleged problems did "require[] correction," Hour had not given Globe the opportunity to remedy them as contemplated by the contract.[6] The court accordingly concluded that the problems Hour identified "could not have

---

6. As noted, the contract allowed Hour to withhold payment if work was "found defective *and not remedied*." (Emphasis added.)

been a basis for Hour withholding the progress payments in earlier months."

¶20 Given these determinations, the court concluded that Hour was not justified in withholding payments. And for similar reasons, the court also concluded that Hour had breached the covenant of good faith and fair dealing.

¶21 Finally, the court determined that Globe's claimed damages were "reasonable," awarded Globe $61,901.92 in damages, held that Globe was entitled to foreclose on the property based on its construction lien, and ruled that Globe was "entitled to an award of reasonable attorney fees and costs as provided by the [c]ontract and Utah Statute."

*Posttrial Litigation on Liability and Damages*

¶22 Hour filed several posttrial motions and objections. In a motion to alter or amend the court's findings and conclusions, Hour challenged the court's conclusions that he was liable for breach of contract and of the covenant of good faith and fair dealing, arguing, among other things, that Globe had performed defective work before Hour withheld any progress payments and that Hour had given Globe notice and time to correct the defective work in September 2016. Hour also argued that he was justified in withholding progress payments due to Globe's failure to pay subcontractors. Hour additionally argued that the court's damages award was contrary to the evidence—namely, Barlow's initial testimony stating that Globe's damages were only $55,533.17.

¶23 At a hearing on Hour's motion, Globe argued that Hour was attempting to "relitigate issues" that "were already ruled on by the [c]ourt." And it further argued that none of the court's findings "were clearly erroneous." The court took the "motion[] under advisement," and it later issued a brief written ruling denying Hour's motion to alter or amend. In doing so, it simply

stated that it was "adopt[ing] the arguments made at the hearing . . . and the briefing submitted by the parties."

*Posttrial Litigation on Prejudgment Interest, Attorney Fees, and Costs*

¶24    After the court issued its initial findings of fact and conclusions of law, Globe filed a proposed judgment that included an award of prejudgment interest pursuant to Utah Code section 15-1-1. (As indicated earlier, the complaint itself had likewise requested an award of prejudgment interest.)

¶25    Globe also filed separate requests for both attorney fees and costs. In support of the request for attorney fees, Globe explained that it was seeking fees for "the legal work performed for the successful litigation for (1) breach of contract, (2) breach of warranty, (3) lien foreclosure, and (4) breach of implied covenant of good faith and fair dealing." Globe also included an attorney fee affidavit that detailed the billing rates of the attorneys involved and the time that each attorney spent on various tasks. Of some note for this appeal, that affidavit (and, by extension, the request) included many entries for travel time from southern Utah to court proceedings in northern Utah where the trial was held. In this application, Globe requested $72,066.00 in attorney fees.

¶26    In the request for costs, Globe asserted that it was entitled to costs under rule 54 of the Utah Rules of Civil Procedure. In an accompanying affidavit of costs, Globe's attorneys itemized and requested costs associated with filing fees, expert witness and mediator fees, subpoena service, and transcripts, and they also itemized and requested costs for such things as food for the attorneys, flights, a VRBO housing rental, and other travel expenses for the attorneys. Altogether, Globe sought $32,179.97 in costs.

¶27    Without awaiting a response from Hour, the court issued a judgment that awarded Globe the prejudgment interest, attorney fees, and costs that it had requested.

¶28    Hour promptly objected. He first argued that there was no basis for awarding prejudgment interest under either Utah Code section 15-1-1 or the contract. Hour also argued that the attorney fee request was unreasonable because, among other things, it contained duplicative entries, asked for fees relating to motions that Globe did not prevail on, and requested fees for time that the attorneys had spent traveling. Hour also argued that "[w]here the parties' evidentiary submissions in support of a request for attorney fees are deficient, so will be the court's evaluation of those fees." (Quoting *Foote v. Clark*, 962 P.2d 52, 56 (Utah 1998).) Finally, with respect to costs, Hour argued that the request was improper because it asked for costs that are not allowable under rule 54 of the Utah Rules of Civil Procedure.

¶29    Globe soon filed a detailed response to Hour's objections. As part of this response, Globe added an additional justification for its requests for prejudgment interest, attorney fees, and costs—namely, that these were all justified under Utah Code section 13-8-5, which Globe broadly contended was applicable to "all construction contracts relating to construction work or improvements."[7] (Quoting Utah Code § 13-8-5(2)(a).) Relying on this statute, Globe "revised" its earlier request for prejudgment interest and now sought the higher interest rate that it contended was awardable under section 13-8-5. With respect to costs, Globe argued that even if costs were limited under rule 54, the court had "sound discretion" to award additional costs under section 13-8-5. And with respect to attorney fees, Globe contended that it was entitled to attorney fees under both the parties' contract and the "statute," in an apparent reference to section 13-8-5. Finally, Globe contended that its request for attorney fees—including fees associated with travel time—was reasonable.

---

7. In a subsequent filing, Globe said that, while preparing this response, it had "discovered" that its earlier request for prejudgment interest had inadvertently been based on section 15-1-1, as opposed to section 13-8-5.

¶30    The parties then engaged in substantial litigation about the prejudgment interest, attorney fees, and costs issues. In the course of this litigation, the parties took starkly contrasting views of whether section 13-8-5 applied to this case: Hour argued that the statute did not apply because Globe had not complied with certain requirements set forth therein, while Globe argued that it did apply and was in fact "created to deter the exact harm suffered by Globe."

¶31    The court held a hearing on the various outstanding motions. It subsequently issued a short order stating that it was ruling in Globe's favor based on "the arguments made at the hearing" and in "the briefing." The court later issued an amended judgment that expressly awarded prejudgment interest pursuant to section 13-8-5, seemed to link the award of attorney fees and costs to that statute as well, and now included additional time that Globe's attorneys had spent litigating the posttrial motions. This award included the following:

- $61,901.92 in damages;

- $108,798.14 in prejudgment interest;

- $98,531.00 in attorney fees; and

- $32,179.97 in costs.


ISSUES AND STANDARDS OF REVIEW

¶32    On appeal, Hour first argues that the district court erred in concluding that he breached the contract when he stopped paying the progress payments. As detailed below, the arguments presented on appeal involve the interpretation of the contract and a review of the district court's findings regarding the alleged breaches. "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling

of the district court." *Richman & Richman LLC v. Redmond*, 2023 UT App 158, ¶ 18, 542 P.3d 130 (quotation simplified). "Whether a party performed under a contract or breached a contract is a question of fact," *iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 43, 424 P.3d 970, and the district court's fact findings "enjoy a high degree of deference" and will be "overturned only when clearly erroneous," *Randolph v. State*, 2022 UT 34, ¶ 18, 515 P.3d 444 (quotation simplified).

¶33 Second, Hour argues that the district court's damages calculation was not supported by the evidence. "The award of damages is a factual determination that we review for clear error." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 29, 133 P.3d 428.

¶34 Third, Hour argues that the district court erred in determining that Globe was entitled to prejudgment interest and costs. As a general matter, a district court's "decision to award prejudgment interest presents a question of law which we review for correctness." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263 (quotation simplified). As indicated, the awards of both prejudgment interest and costs were based on the court's conclusion that Utah Code section 13-8-5 applied. "Matters of statutory construction are questions of law that are reviewed for correctness." *Id.* (quotation simplified).[8]

---

8. Costs awards are generally "reviewed under an abuse of discretion standard." *Jensen v. Sawyers*, 2005 UT 81, ¶ 140, 130 P.3d 325 (quotation simplified). But "legal errors, such as the incorrect interpretation of a statute or the application of an improper legal standard, are usually an abuse of discretion," *Hillam v. Hillam*, 2024 UT App 102, ¶ 26, 554 P.3d 1137 (quotation simplified), and it's axiomatic that legal errors are reviewed for correctness, *see ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 23, 309 P.3d 201. As discussed below, we conclude that the costs award in this case was based on an incorrect interpretation of a statute,

(continued…)

¶35     Finally, Hour argues that the district court awarded Globe unreasonable attorney fees. As our supreme court has explained:

> Attorney fees are awarded only when authorized by statute or by contract. The award of attorney fees is a matter of law, which we review for correctness. However, a trial court has broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard. The standard of review on appeal of the amount of a trial court's award of attorney fees is patent error or clear abuse of discretion.

*Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325 (quotation simplified).

ANALYSIS

I. Breach of Contract

¶36     As noted, Globe sued Hour for breach of contract, and Hour then counterclaimed, asserting that he was justified in stopping payments by Globe's own breaches of the contract. At the close of trial, the district court ruled in Globe's favor.

¶37     On appeal, Hour does not challenge the district court's finding that he did not pay the "July 2016, August 2016, and September 2016 pay applications," nor does he challenge its conclusion that, without justification, his nonpayments would have been a "material breach" of the contract. Instead, as he did

---

as opposed to a discretionary decision about how much in costs to award under an applicable rule, so we regard the portion of the ruling that we're reviewing as being one that's initially reviewed for correctness.

below, Hour argues that he was justified in his nonpayments because of Globe's own breaches of the contract. More specifically, Hour claims that by the time he stopped paying, Globe had already breached in four ways: (A) performing defective work; (B) failing to timely pay subcontractors; (C) failing to timely complete the project; and (D) hiring an unlicensed subcontractor.

¶38    As indicated, "defective" work and failing to make "prompt and proper payments" to subcontractors were two of the four conditions set forth in the contract that would allow Hour to "withhold" the progress payments. The remaining two justifications that Hour advances on appeal (not timely completing the project and hiring an unlicensed subcontractor) were not included in that list. As a result, Hour invokes what has sometimes been referred to as the "first breach rule." Under that rule, "when one party materially breaches a provision of a contract, the other party's subsequent failure to perform a specific obligation is excused if the promises are mutually dependent." *Larson v. Stauffer*, 2022 UT App 108, ¶ 26, 518 P.3d 175 (quotation simplified); *see also Cross v. Olsen*, 2013 UT App 135, ¶ 25, 303 P.3d 1030 ("Under the first breach rule a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform." (quotation simplified)). Hour thus argues that because "the undisputed evidence shows Globe breached first," he was entitled to stop paying his obligations under the contract.

A.    Defective Work

¶39    Hour first argues that Globe breached the contract "by performing noncompliant and defective work." But the court took evidence on this very issue throughout trial. In its ruling, the court found that the workmanship issues Hour pointed to at trial did not "arise until September 22, 2016, months after Hour decided to withhold payment," that Hour had not notified Globe of his complaints until that same date, and that Hour still believed the

project "was substantially complete by September 28." The court further found that, even if the alleged problems did "require[] correction," "Hour never gave Globe the ability to correct any problems" related to the allegedly defective work "and therefore was not justified in withholding the progress payments" on this basis.

¶40    Hour challenges these findings on appeal, pointing to evidence that, in his view, shows that the work was defective before he stopped payments and that he gave Globe the opportunity to remedy it. But in advancing these challenges, Hour does not first marshal the evidence supporting the court's findings, much less account for that evidence. "A party challenging a district court's factual findings on appeal bears a heavy burden of persuasion in demonstrating that the court's findings are clearly erroneous." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 15, 508 P.3d 612 (quotation simplified). The marshaling obligation is properly understood as "a natural extension of an appellant's burden of persuasion." *State v. Nielsen*, 2014 UT 10, ¶¶ 40–41, 326 P.3d 645, *superseded by statute on other grounds as recognized in State v. Richins*, 2025 UT 10, 568 P.3d 1046. And a party that is challenging a fact finding "will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal and respond to evidence or authority that could sustain the decision under review." *In re Discipline of LaJeunesse*, 2018 UT 6, ¶ 28, 416 P.3d 1122 (quotation simplified).

¶41    This was a complicated case that raised a host of fact-intensive issues and resulted in a lengthy record. Because Hour failed to comply with his marshaling obligations, we conclude that he failed to satisfy his burden of persuading us that, in light of the whole record (as opposed to the evidence that supported his view of things), the findings recounted above were clearly erroneous. And accepting those findings as true, we see no basis for concluding that, on account of defective workmanship, Hour was justified in withholding payment for the July pay application or those that followed, given that evidence shows that the issues

did not arise until later and Hour had not provided Globe with the opportunity to remedy the problems. We therefore reject this claim.

B.     Payment to Subcontractors

¶42    Under the contract, Globe was required to "provide and pay for all labor, materials, . . . and other services necessary for the proper completion of work on the project in accordance with the contract documents." As indicated, one of the four conditions by which Hour could withhold progress payments was a failure by Globe to "make prompt and proper payments" to a subcontractor. On appeal, Hour argues that Globe breached the contract by failing to pay some of its subcontractors, thus justifying his decision to stop paying.

¶43    As an initial matter, we note that the district court did not specifically find, in its findings of fact and conclusions of law, that Globe had not breached in this regard. But even so, "unstated findings can be implied" if "it is reasonable to assume" that the district court "actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *In re A.S.*, 2024 UT App 52, ¶ 20 n.6, 548 P.3d 181 (quotation simplified), *cert. denied*, 554 P.3d 988 (Utah 2024); *see also State v. Stewart*, 2019 UT 39, ¶ 27, 449 P.3d 59 (noting that the supreme court has "occasionally endorsed the propriety of a regime" in which an appellate court may "assume that the trier of facts found facts in accord with its decision despite the absence of express findings of fact" (quotation simplified)). Here, it is reasonable to assume that the district court impliedly found that Globe did not breach in this regard. After all, Hour pleaded this issue in his counterclaim and presented evidence on it at trial. At the close of trial, the district court resolved the case through its mutually reinforcing conclusions that (1) Hour breached and (2) Hour's breach was not justified by any breach from Globe. Moreover, after Hour again raised the issue relating to nonpayment of subcontractors in his

posttrial motion to amend, Globe's response was that Hour was attempting to "relitigate issues" that "were already ruled on by the [c]ourt." When the district court later denied that motion, it did so based on its decision to "adopt[] the arguments" from the parties. From all this, we think it clear enough that the district court impliedly found that Globe did not breach by failing to pay subcontractors.

¶44 So viewed, the record does not support Hour's assertion that he was justified in stopping payments based on any failure by Globe to pay a subcontractor. To the contrary, the evidence presented at trial showed that one of the particular subcontractors in question didn't even send an invoice for its work until August 24, 2016, and it further showed that Globe would have paid this subcontractor out of the payment that was due to it at the end of August, which, again, Hour never made. As Globe succinctly puts it in its brief, it could not "pay subcontractors when Hour did not pay Globe." And it further shows that Globe did pay the other subcontractors identified by Hour.

¶45 We therefore see no basis for concluding that, at the time that Hour stopped paying, Globe had already materially breached the contract by not paying any of the subcontractors.

C.     Timely Completion

¶46 Hour next argues that by the time he stopped paying, Globe had materially breached the contract by not timely completing the building. As indicated, this seems to have been the principal argument Hour made at trial. But at the close of trial, the court rejected this argument for two reasons: first, it held that Globe was not required to complete the project by July 2016, particularly given that time was not of the essence for purposes of this contract; second, the court held that even if time was of the essence, Globe had not violated its obligations at the time that Hour stopped paying because the delays were attributable to both weather and Hour's own actions (namely,

Hour's change orders). We see no basis for overturning either determination.

¶47     First, Hour challenges the court's conclusion that time was not of the essence for purposes of this contract. Hour acknowledges that there was no such clause in the contract. But he nevertheless points out that in *Barker v. Francis*, our supreme court held that, even without such a clause, "the circumstances surrounding the transaction can imply that the parties intended timeliness of performance to be of paramount concern." 741 P.2d 548, 552 (Utah 1987).

¶48     It's not clear to us that *Barker* is as applicable here as Hour claims it is. *Barker* involved a real estate purchase contract. *Id.* at 550. And we have since distinguished several time-of-the-essence cases, in part, by noting that, like *Barker*, they involved the "limited circumstances of a real estate escrow transaction." *iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 58 n.12, 424 P.3d 970. Hour has not pointed to any authority that arose outside of the context of real estate contracts that allowed courts to imply that time was of the essence.

¶49     Moreover, some authorities suggest that courts generally do *not* imply that time was of the essence in the particular context of construction contracts. *See, e.g.*, 13 Am. Jur. 2d *Building and Construction Contracts* § 49 (2025) ("As a general rule, time is not of the essence of a building or construction contract in the absence of a provision in the contract making it so; the mere statement of a date in such a contract does not make time of the essence."). As explained by one respected treatise, because "[d]elays are common in construction and building contracts for many reasons," "time is not ordinarily of the essence of a building or construction contract," and "[t]his rule holds true even where the parties have expressly agreed to a specific time of performance in their contract and even, according to some courts, where there is a nonnegotiated boilerplate clause in the contract providing that

time is of the essence." 15 Williston on Contracts § 46:7 (4th ed. 2024).

¶50    Regardless, we have no need here to definitively determine whether it can ever be legally possible to imply, from circumstances alone, that time was of the essence for a particular construction contract. This is so because we see no basis for reversing the district court's conclusion that it was not of the essence here. Hour points to two circumstances that, in his view, made time of the essence: (1) testimony suggesting that the lease for the office building that he was using during the construction was set to expire in October 2016, and (2) testimony that the contractor he hired to replace Globe was aware of his anticipated October 2016 move-in date. But Hour points to no testimony or evidence showing that *Globe* was aware that Hour had to move out of his prior building by October 2016, let alone testimony showing that Globe was aware of this when the parties negotiated the contract. Without such testimony or evidence, we see no basis for concluding that there was a meeting of the minds on this implied term. And in light of this, we cannot conclude that the district court erred when it declined to recognize this as an implied term.

¶51    Second, we also see no basis for reversing the district court's conclusion that, even if the 210-day provision could be interpreted as a material provision, Globe did not breach its obligations. As noted, with regard to the 210-day provision, the contract expressly provided that Globe's timing obligations could be "extended by a change order" by Hour, or instead when Globe was "delayed in work progress by changes ordered" or by "weather." In its ruling, the court expressly held that, at the time that Hour stopped paying, the delays in the project were attributable to both weather and "change orders by Hour," these delays "were not the fault of Globe," and "the date of substantial completion was extended to November 29, 2016."

¶52     Hour challenges these determinations on appeal. But in doing so, he fails to marshal the evidence supporting the court's findings about the weather delays—indeed, although this was one of the district court's express justifications for rejecting Hour's timing-related argument, the word "weather" appears just a single time in Hour's opening brief, and when it does, it's in a passing reference to the court's ruling. Hour also fails to marshal the evidence showing that Globe's delays were attributable to his own change orders. Regardless, we note that, marshaling problems aside, there was evidence to support both determinations. At trial, there was testimony and evidence about the weather associated delays, including "abnormally cold weather below freezing" in December and January that "prevent[ed] work" on nine days, as well as "rain fall and subsequent mud in January to April [that] delayed the construction 21 working days." There was also substantial testimony about Hour's change orders during the project, including, of note, in June and July 2016. In addition, Globe also called a construction expert at trial, who opined that based on the various delays, which were "outside of [Globe's] control," the revised substantial completion date for construction was "November 29, 2016." The district court appears to have credited this testimony.

¶53     As a result, on the basis of this record and the arguments presented to us, we are not persuaded that the court erred in its determination that, at the time Hour stopped paying, Globe was justified in the delays and therefore had not breached the contract.

D.     Unlicensed Subcontractor

¶54     Under one of the terms of the contract, Globe "agree[d] not to employ for work on the project any person unfit or without sufficient skill to perform the job for which he or she was employed." At trial, the district court heard evidence that one of the subcontractors who worked on the project did not "have a license at the time of the construction." The court also heard

evidence suggesting that this subcontractor previously had a "license for 20 years," but the license had "expired" at some prior point, and the court further heard evidence that Globe discovered this "a little bit after" the work in question had been performed.

¶55 As with the issue relating to the nonpayment of subcontractors, the district court did not specifically address this in its findings of fact and conclusions of law. But for the same reasons given above relating to that issue, we think it reasonable to assume that the court impliedly found that Globe did not breach in this regard. Again, the issue was tried and submitted to the court, and the court's ruling was premised on the reinforcing notions that Hour had breached but Globe did not.

¶56 Contrary to the assertions advanced by Hour on appeal, we see no basis for overturning the court's implied determination that Globe did not breach in this regard. This is so for two reasons.

¶57 First, we see no indication from this contract that this was a breach. As indicated, the clause in question did not require all subcontractors to have a "license." Rather, it prohibited Globe from employing subcontractors who were "unfit" and "without sufficient skill." Those terms were not further defined, and Hour has not pointed to any evidence suggesting that the parties ever agreed that these terms referred to a subcontractor's licensing status. If Hour had wanted to insist that all subcontractors must be "licensed," he could have negotiated that as a term of the contract. Because he didn't, "we decline to read such language into the contract now." *Airstar Corp. v. Keystone Aviation LLC*, 2022 UT App 73, ¶ 57, 514 P.3d 568; *see also Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179 ("We will not make a better contract for the parties than they have made for themselves.").

¶58 Second, we also note that the first breach rule is not triggered by just any breach of the contract. Rather, it becomes operative when the other party is "guilty of a substantial or

material breach of contract," *Cross*, 2013 UT App 135, ¶ 25 (quotation simplified), and "the promises are mutually dependent," *Larson*, 2022 UT App 108, ¶ 26 (quotation simplified).

¶59 On appeal, Hour points to a provision in the Utah Construction Trades Licensing Act that requires contractors to be licensed. And he likewise points to our decision in *State v. Bohne*, where, in conjunction with a criminal prosecution of a contractor for operating without a license, we held that the "legislative purpose for the Construction Trades Licensing Act is to protect the public from inept and financially irresponsible builders." 2001 UT App 11, ¶ 11, 18 P.3d 514 (quotation simplified). We have no quarrel here with the propositions that contractors and subcontractors alike must comply with applicable licensing rules and that any failure to do so can subject them to applicable penalties. But this appeal does not involve a challenge to the subcontractor's licensing status, nor does it involve any discipline that was or should have been imposed on Globe for unwittingly employing an unlicensed subcontractor. Rather, this is an appeal from a breach of contract action, and the more particular question in front of us is whether it was somehow a material breach of the contract for Globe to employ an unlicensed subcontractor.

¶60 While the record on this is somewhat sparse, it does indicate that Hour was not even aware of the problem with the subcontractor's license until after he had stopped paying, and while the record indicates that the subcontractor's license had lapsed, it does not indicate that this was due to some problem of skill (as opposed to being for something like nonpayment of fees). Having considered the matter, it seems to us that if the work performed by the subcontractor was substandard in some important way, this could have supported a claim of material breach for defective work. As discussed above, however, Hour has not persuaded us that there were any such problems of workmanship at the time that he stopped paying. And Hour has not separately persuaded us that the licensing status of the subcontractors itself was so important to the parties that it would

be a material breach of the contract for Globe to employ an unlicensed subcontractor (even if the subcontractor was otherwise providing capable work), particularly where the parties didn't think to include any language about the licensing status of the subcontractors in the contract at all. Nor has he persuaded us that his obligation to pay the monthly progress payments was in any way "mutually dependent" on any unspoken understanding that the subcontractors would have active licenses (as opposed to simply being fit and capable of performing the work for which they had been hired).

¶61    We therefore decline to reverse the judgment on this basis. And because we have rejected each of Hour's other challenges to the court's conclusion that he was liable for breach of contract, we affirm that decision.[9]

## II. Damages

¶62    Hour next challenges the damages award, arguing that it was flawed in two respects: first, Hour claims that Globe did not lay a sufficient foundation for the revised estimate that it submitted during the 2023 portion of the trial; and second, Hour claims that there was insufficient evidence to support the ultimate award. We disagree on both fronts.

¶63    First, Hour claims that the revised damages estimate was inadmissible under rule 1006 of the Utah Rules of Evidence because Globe did not call "a competent witness to establish the

---

9. Hour also argues that the district court erred in concluding that he breached the covenant of good faith and fair dealing. In doing so, Hour repeats the same arguments he made relating to the breach of contract claim. Put differently, Hour simply contends that because he did not breach the contract, he likewise did not breach the covenant of good faith and fair dealing either. We reject this argument for the same reasons that we rejected Hour's arguments relating to the breach of contract itself.

necessary foundation for the summary and the underlying records." (Quoting *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2013 UT App 146, ¶ 20, 305 P.3d 171.) But as noted above, Hour's counsel affirmatively stipulated that Globe could submit the revised estimate at trial. And in context, it seems that the point of this stipulation was to relieve Globe of the necessity of going through certain steps such as calling a foundational witness. Hour has provided us with no legal basis for relieving him of this stipulation. In light of it, we reject his assertion that Globe was required to call a foundational witness before submitting the revised damages estimate.

¶64    Second, Hour argues that, even if the revised estimate could be submitted, the district court erred in basing its damages award on it. Hour claims that Globe's submission was nothing more than an "incomplete estimate of costs." By contrast, he claims that he provided the court with "reasonably certain" lists of "expenses" and "offsets." In his view, because his evidence was more precise than Globe's, the court should have based the damages award on his evidence, not Globe's.

¶65    But as we've recently explained, "a district court can rely on estimates in awarding damages if the estimate is the most direct, practical and accurate method that can be employed." *Capozzoli v. Madden*, 2024 UT App 176, ¶ 29, 561 P.3d 727 (quotation simplified). Moreover, in cases like this one, our appellate courts have recognized that the district court is empowered to decide what evidence to accept and what amount is necessary to make the plaintiff whole. *See, e.g., Bevan v. J.H. Constr. Co.*, 669 P.2d 442, 444 (Utah 1983) ("[T]he general rule of damages . . . arms the trial court with the discretion to place the litigants as nearly as possible in the position they would have enjoyed had the contract not been breached."); *Wagstaff v. Remco, Inc.*, 540 P.2d 931, 934 (Utah 1975) ("The fact that [the defendant] may have actually spent the money on some of these accounts for labor and materials does not necessarily compel a finding that it is entitled to reimbursement therefor. It is only entitled to

reimbursement, and offset on the account, for whatever the trial court believed upon competent evidence was the reasonable and necessary amount for such labor and materials."); *see also Yelderman v. Yelderman*, 669 P.2d 406, 408 (Utah 1983) (noting that "it is within the province of the fact finder to believe those witnesses or evidence it chooses"); *Knowlton v. Knowlton*, 2023 UT App 16, ¶¶ 59 n.13, 63, 525 P.3d 898 (noting that a district court "is in the superior position to assess the weight of evidence" and, in the context of a domestic case, affording discretion to district courts in deciding which valuation of property to accept). And we again note that the "award of damages is a factual determination that we review for clear error." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 29, 133 P.3d 428.

¶66    Here, the parties clearly disagreed about how much Globe should be awarded in damages. But, by virtue of the stipulation, Globe's revised damages estimate was admissible. With that in evidence, Hour has provided us with no persuasive support for his assertion that the district court could not choose to credit it. We therefore are not persuaded that the damages award was clearly erroneous.

### III. Prejudgment Interest and Costs

¶67    In its amended judgment, the district court awarded Globe both prejudgment interest and costs pursuant to Utah Code section 13-8-5. Hour now challenges those awards. In our view, section 13-8-5 was inapplicable to this case, so we reverse those awards and remand for further proceedings consistent with our directions below.[10]

---

10. The court initially awarded both costs and attorney fees "as provided by the [c]ontract and Utah Statute." As will be discussed in Part IV, there was a basis in the contract for an award of attorney fees, so we separately address the attorney fee award

(continued…)

A.      The Section 13-8-5 Scheme

¶68      Utah Code section 13-8-5 has received very little treatment in the caselaw. It has been cited in only two decisions, both of which came from federal district courts (and one of which was unpublished). *See Industrious Service Group, Inc. v. Henry F. Teichmann, Inc.*, No. 23-cv-00389, 2023 WL 6444049, at *1 (D. Utah Oct. 3, 2023); *Cross Marine Projects, Inc. v. Morton Salt, Inc.*, 396 F. Supp. 3d 1037, 1039 (D. Utah 2019). It has not yet been cited by any Utah appellate decision.

¶69      But having considered the matter here, we conclude that this statute simply does not apply in this case and therefore could not be used as the legal justification for an award of either prejudgment interest or costs. To explain why, we think it instructive to first discuss how this statute operates as a whole. After all, when we interpret a statutory provision, we do so "in light of its linguistic, structural, and statutory context," and we also consider the provision "in the context of the overall statutory scheme." *Utah Am. Energy Inc. v. Labor Comm'n*, 2021 UT App 33, ¶ 15, 484 P.3d 1195 (quotation simplified); *see also Orten v. Utah County*, 2024 UT App 132, ¶ 28, 558 P.3d 900 (noting that "when interpreting statutory schemes, Utah courts often apply the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts" (quotation simplified)).

¶70      Section 13-8-5 applies to "all construction contracts relating to construction work or improvements entered into on or after July 1, 1999," between various kinds of construction-related entities. Utah Code § 13-8-5(2)(a). And the statute is largely

---

there. But because there was not a provision in the contract entitling either party to an award of costs, Globe's request for the costs award needed to instead be justified by either a statute or a rule. As indicated, the only statute the court ultimately pointed to in support of the costs award was Utah Code section 13-8-5.

structured around provisions from contracts relating to "retention proceeds"—that term or some variant thereof appears repeatedly throughout the statute, and as a function of both substance and even grammar, it's the lynchpin to understanding the statute's various terms. Of note, the term "retention proceeds" is statutorily defined in subsection 13-8-5(1)(i) as being the "money earned by a contractor or subcontractor but *retained* by the owner or public agency pursuant to the terms of a construction contract *to guarantee payment or performance* by the contractor or subcontractor of the construction contract." *Id.* § 13-8-5(1)(i) (emphases added).

¶71 Section 13-8-5 has eleven subparts. For purposes of understanding why this statute is inapplicable to this case, the key parts of the scheme are these:

- Subsection (3) places certain limits on the amount of retention proceeds that can be withheld—namely, the "total retention proceeds withheld may not exceed 5% of the total construction price." *Id.* § 13-8-5(3)(b).

- Subsection (4) states that if "payment on a contract . . . is retained or withheld . . . as retention proceeds, it shall be placed in an interest-bearing account and accounted for separately from other amounts paid under the contract." *Id.* § 13-8-5(4)(a). Subsection (4) then states that the interest accrued on these retention proceeds must be "for the benefit of the contractor and subcontractors" and must be "paid after the project is completed and accepted by the owner." *Id.* § 13-8-5(4)(b)(i)–(ii). And it further states that the retention proceeds and interest "are considered to be in a constructive trust for the benefit of the contractor and subcontractors who have earned the proceeds." *Id.* § 13-8-5(4)(d)(i).

- Subsection (5) states that "[a]ny retention proceeds retained or withheld pursuant to this section and any

accrued interest shall be released pursuant to a billing statement from the contractor" within 45 days of certain defined events relating to the completion of the project. *Id.* § 13-8-5(5).

- Subsection (7) states that the billing statement referred to in subsection (5) must "include documentation of lien releases or waivers." *Id.* § 13-8-5(7).

- Finally, subsection (10)—which is the provision that the district court ultimately invoked below—states that "[i]n any action for the collection of the retained proceeds withheld and retained in violation of this section, the successful party is entitled to: (i) attorney fees; and (ii) other allowable costs." *Id.* § 13-8-5(10)(a).

¶72    Taken as a whole, section 13-8-5 thus sets forth a detailed scheme under which, pursuant to the terms of a construction contract, a party can *retain* certain funds, in certain amounts, under certain delineated circumstances, and for the specific purpose of guaranteeing performance by the other side. This statute then contemplates that these *retained* funds will be released to the contractor once work is completed. In this sense, this statute essentially sets forth something of an escrow scheme for construction contracts. Indeed, the title of the statute itself refers to the creation of an "interest-bearing escrow account."[11]

---

11. "We recognize that the title of a statute is not part of the text of a statute, and absent ambiguity, it is generally not used to determine a statute's intent." *Clean Harbors Env't Services v. Labor Comm'n*, 2019 UT App 52, ¶ 14 n.2, 440 P.3d 916 (quotation simplified). That said, even if a statute is not ambiguous, courts will sometimes note the title of a statute when it "is entirely consistent with the plain meaning of the text." *Id.* In such a circumstance, the title essentially functions as something of a

(continued…)

B.      The Applicability of Section 13-8-5 to This Case

¶73    Again, the district court awarded prejudgment interest and costs under Utah Code section 13-8-5(10). In the parties' initial briefs on appeal, each party claimed that the other party failed to take certain steps required by this statute. In his opening brief, Hour faulted Globe for not providing him with "a complete billing statement containing 'lien releases or waivers'" as required by section 13-8-5(7). In its responsive brief, Globe asserted that it wasn't required to submit a billing statement (or the accompanying lien releases and waivers) because Hour had "retained" more money than he was allowed under subsection (3), and, perhaps more importantly, because Hour never put the money in an interest-bearing account as required by subsection (4). In his reply brief, Hour did not claim that Globe was mistaken on these assertions; instead, Hour accepted them, and he then asserted that these collective failures illustrate why Globe has "no claim to prejudgment interest" or costs under this statute at all. As discussed, this was the view Hour took below as well.

¶74    We agree with Hour that the statute did not apply to the claims at issue in this case. Globe's position seems to assume that this statute is operative whenever a party to a construction-related contract stops paying the contractor. But the plain language and structure of the statute both belie this broad assertion. Instead, they show that this statute is targeted at something more specific. As discussed, this statute applies when money that is "earned by a contractor" is "retained" in specifically defined amounts "pursuant to the terms of a construction contract" in order "to guarantee payment or performance," when the owner places that money in a specific kind of account that functions as a "constructive trust for the benefit of the contractor," and when it's

_____

corroborative data point. Here, we believe that the reference in the title of this statute to an "interest-bearing escrow account" is corroborative of the various provisions from the statutory text that we've laid out.

contemplated that this money will be "released" to the contractor at the conclusion of the project pursuant to a defined process that includes billing statements and lien releases or waivers. *Id.* § 13-8-5(1)(i), (3), (4)(a), (4)(d)(i), (5), (7). When this kind of contractual provision relating to the retention of funds has been invoked, and there is a subsequent "action for the collection of the retained proceeds withheld and retained in violation of this section," the statute allows the "successful party" to receive an award of prejudgment interest, attorney fees, and costs. *Id.* § 13-8-5(10)(a)–(b).

¶75    But no party has alleged that any of these predicates occurred here. When Hour stopped paying the monthly progress payments, he didn't purport to "retain" the proceeds "pursuant to the terms of the construction contract," nor did he ever put the "earned" monies into an interest-bearing account that would be for the benefit of Globe once the project was completed. Rather, at all relevant times in this case, Hour informed Globe of his intent to terminate the contract. He initially did so in both the June and July 2016 letters. And while he then apparently changed his mind and gave Globe until September, he then officially "terminated" the contract at the end of that month. It seems to be for precisely this reason that Globe never submitted billing statements accompanied by lien releases and waivers—Globe wouldn't have thought it needed to do so, because Hour had never claimed that he was *retaining* funds pursuant to this statutory scheme at all. Instead, Hour's position had simply been that he could *terminate* the contract because Globe had already breached it. Simply put, terminating a contract outright is not the same thing as putting funds into an escrow account pursuant to a process that is defined by contract and regulated by statute for the purpose of ensuring continued performance under the continued existence of that contract.

¶76    We therefore agree with Hour's assertion that the kinds of claims that were litigated in this case weren't covered by the scheme set forth in section 13-8-5. Rather, because the claims that

were litigated were essentially traditional breach of contract claims, the remedies that Globe received when it prevailed needed to be based on some source of authority other than this statute.

¶77 As a result, the district court erred when it awarded prejudgment interest and costs under section 13-8-5. We therefore vacate those awards and remand with instructions for the district court to determine, in the first instance, whether Globe is entitled to prejudgment interest and costs under some other applicable source of authority.[12]

## IV. Attorney Fees

¶78 In its initial ruling, the district court awarded Globe $98,531.00 as "an award of reasonable attorney fees . . . as

---

12. In conjunction with the costs portion of the award, the parties spent much effort in the briefing addressing the question of whether some of the expenses that seem to have been included in the court's order can be awarded as costs pursuant to Utah Code section 13-8-5(10)(a)(ii). These included expenses relating to, among other things, food, travel, and hotels. But we've now concluded that this statute was inapplicable, so we've vacated that award.

In its brief, Globe also argues that it is entitled to costs pursuant to rule 54(d) of the Utah Rules of Civil Procedure. We leave it up to the district court to determine, on remand, whether and to what extent costs will be awarded under that rule. In doing so, the court should pay attention to the "distinction between legitimate and taxable costs and other expenses of litigation which may be ever so necessary, but are not taxable as costs." *Stevensen 3rd East, LC v. Watts*, 2009 UT App 137, ¶ 62, 210 P.3d 977 (quotation simplified); *see also id.* ¶ 63 ("Costs are defined as those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment." (quotation simplified)).

provided by the [c]ontract and Utah Statute." It's unclear which statute the court was referring to when it issued this initial ruling. While Globe has subsequently justified that award based on Utah Code section 13-8-5(10), we've now held that section 13-8-5 is inapplicable.

¶79    But as noted by the court, the contract itself also provided for an award of attorney fees, stating that "[i]f any action is filed in relation to this Agreement, the unsuccessful party in the action shall pay to the successful party, in addition to all the sums that either party may be called upon to pay, a reasonable sum for the successful party's attorney fees." Based on this contractual language, the court therefore had a proper basis for awarding a "reasonable sum" in attorney fees. *See Capozzoli*, 2024 UT App 176, ¶ 48 ("In Utah, attorney fees are awarded only if authorized by statute or contract. If provided for by contract, attorney fees are awarded in accordance with the terms of the contract." (quotation simplified)). To the extent that this award was based on the contractual language, Hour now challenges the award on two bases. We disagree with Hour's first contention, but we agree in part with his second, so we accordingly remand on a limited basis.

¶80    First, Hour argues that the court erred by awarding attorney fees that were based on time that Globe's attorneys spent litigating "unsuccessful motions, claims, causes of action and regarding dismissed defendants." But this assertion is at odds with the record. In a sworn affidavit that was filed in support of the application for attorney fees, one of Globe's attorneys detailed the work performed by the various attorneys at the firm in conjunction with this case. Of note, this affidavit stated that the attorney fee request included "detailed descriptions of the time spent on, and the legal worked performed, for the *successful* litigation for (1) breach of contract, (2) breach of warranty, (3) lien foreclosure, and (4) breach of implied covenant of good faith and fair dealing." (Emphasis added.) On its face, the assertion that Globe was requesting fees for the "successful litigation" suggests that Globe was indeed limiting its request to fees incurred for the

successful parts of the litigation. Moreover, counsel then provided several pages of charts that contained itemized entries. Hour has not pointed to any entry that appears linked to any unsuccessful motion. On the basis of the record and arguments presented to us, we see no basis for concluding that the attorney fee award was improperly based on time spent litigating unsuccessful motions, claims, causes of action or against dismissed defendants. *See generally Brown v. David K. Richards & Co.*, 1999 UT App 109, ¶ 19, 978 P.2d 470 ("We have awarded fees to a prevailing party even though some of the fees may not have been incurred on strictly compensable issues, because proof of the compensable and non-compensable claims overlapped.").

¶81 Hour's second argument has to do with attorney fees that were awarded for travel time. As noted above, after Globe filed suit in the Third District, it hired attorneys who were located in southern Utah, and those attorneys then litigated the case throughout. In the aforementioned attorney fee affidavit, Globe requested fees for, among other things, time that its attorneys spent traveling. Without differentiating between the various items listed in the affidavit, the district court awarded the requested fees, concluding that the fee request was "reasonable." On appeal, however, Hour argues that it was unreasonable for the court to award fees associated with travel time, given that Globe "voluntarily chose" to hire attorneys who lived several hours away from the site of the litigation.

¶82 At the outset, we note that a district court "has broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard." *Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325 (quotation simplified); *see also Freight Tec Mgmt. Group Inc. v. Chemex Inc.*, 2021 UT App 92, ¶ 20, 499 P.3d 894 ("The calculation of reasonable attorney fees is in the sound discretion of the trial court . . . ." (quotation simplified)). But there has been little Utah appellate authority that has addressed the particular question of whether there are limits to a district court's discretion to award

fees based on an attorney's travel time. The one Utah case that addressed travel time at all is *Strohm v. ClearOne Communications, Inc.*, 2013 UT 21, 308 P.3d 424. There, our supreme court affirmed an attorney fee award that included travel time for out-of-town attorneys, albeit at a "25 percent reduction." *Id.* ¶ 59. Without much elaboration, the supreme court suggested that while such an award falls within the discretion of the district court, a district court should account for work "actually performed" as well as any other "circumstances which require consideration of additional factors." *Id.* (quotation simplified).

¶83 Surveying the legal landscape, we see no definitive rule from other jurisdictions that have considered whether it's appropriate to include an attorney's travel time in an attorney fee award, particularly when one party chose to retain non-local counsel. Some courts and authorities have allowed travel time to be included simply on a showing that it would be "reasonable." *See, e.g., Apple Corps. Ltd. v. International Collectors Society*, 25 F. Supp. 2d 480, 499 (D.N.J. 1998); 35B C.J.S. *Federal Civil Proc.* § 1359 (2025). This comports with other authority suggesting that this kind of decision is best left to the discretion of the district court. *See, e.g., Texas Mutual Ins. Co. v. DeJaynes*, 590 S.W.3d 654, 670 (Tex. App. 2019). Some cases, however, have cautioned that travel time for non-local counsel should be awarded at a reduced rate. *See, e.g., Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir. 1990); *Maceira v. Pagan*, 698 F.2d 38, 40 (1st Cir. 1983); *Clark v. Phillips*, 965 F. Supp. 331, 336 (N.D.N.Y. 1997). By contrast, some other courts have held that it would be inappropriate to award travel time for non-local counsel absent a showing of "special circumstances," such as proof that competent local counsel could not be obtained. *See Hahamovitch v. Hahamovitch*, 133 So.3d 1062, 1063 (Fla. Dist. Ct. App. 2014). And some courts have permitted such an award, but only on a showing that this is consistent with the practice norm from the local community. *See, e.g., Planned Parenthood of Central N.J. v. Attorney Gen. of State of N.J.*, 297 F.3d 253, 267–68 (3d Cir. 2002).

¶84 Given the lack of Utah authority on this question, we think it appropriate to offer some additional guidance. A party is entitled to hire counsel of its choice, and whenever a retained attorney is required to travel to court, the time the attorney spends traveling is time that the attorney is spending on the client's behalf—and not, presumably, working for some other paying client. On this basic level, this seems to be why our supreme court in *Strohm* contemplated that a district court's discretion to award attorney fees includes the discretion to include travel time.

¶85 But we also believe that if a party voluntarily chooses to hire non-local counsel who lives and practices some distance away, this may alter the district court's calculus as to whether it would still be reasonable to charge the other party for that travel time as part of an attorney fee award. On the one hand, the party who hired non-local counsel may have had compelling reasons for hiring this attorney over others who were closer to the court, such as subject-matter specialty, a longstanding relationship, or perhaps even some favorable adjustment in the billing rates. On the other hand, we also see some potential merit to Hour's suggestion that, depending on the circumstances and the strength of those justifications, it may be unfair to compel a party to foot the bill when the other side chooses to hire a non-local attorney who then must spend many hours of billable time traveling to and from court.

¶86 Given the number of potential considerations that are in play in such a decision, this seems to be the kind of decision that is best left to the discretion of the district court. A district court is better equipped than an appellate court to determine whether the party's decision to employ non-local counsel was reasonable under the particular circumstances, and the district court is likewise better equipped to determine whether the attorney's rates for travel time should be charged in full or, as was the decision of the district court in *Strohm*, at some reduced rate.

¶87  With this as the backdrop, we accordingly disagree with Hour's assertion that it was categorically unreasonable for the district court in this case to have awarded travel time as part of the attorney fee award. As indicated, our supreme court's decision in *Strohm* places this kind of decision within the district court's discretion.

¶88  In addition to challenging the court's ability to make this determination, however, Hour also argues that the district court did not provide a sufficient explanation for *why* it thought it was reasonable to award attorney fees for travel time in these circumstances. In this sense, Hour is challenging the adequacy of the court's explanation for this award.[13] Having reviewed the court's rulings, we see no clear explanation for why the court believed it was reasonable under the circumstances to require Hour to pay attorney fees associated with travel time, particularly given that Globe hired attorneys who lived several hours away from the district in which the case had been filed. In light of the concerns expressed above, we think it appropriate to require a district court to offer at least some explanation for such a decision when the other party has opposed this kind of request. Such an explanation is warranted, in part, because it facilitates the appellate court's review if the other party makes a reasonableness challenge akin to the one advanced by Hour in this appeal.

¶89  Because we see no explanation from the court that would allow us to review this decision for reasonableness, we reverse the attorney fee award and remand with instructions for the district court to give an explanation for this portion of the attorney fee award. In so doing, we stress that our decision should not be

---

13. Globe has not argued in response that the inadequacy portion of Hour's claim was unpreserved, nor has it meaningfully responded to the inadequacy argument itself. Instead, Globe's argument was simply that the court's decision was reasonable.

interpreted as preemptively putting our thumb on the scale either way.[14]

---

14. Globe requests attorney fees incurred on appeal pursuant to rule 24(a)(9) of the Utah Rules of Appellate Procedure. "As a general matter, when a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Elder v. Elder*, 2024 UT App 68, ¶ 32, 550 P.3d 488 (quotation simplified); *see also Maxwell Masonry Restoration & Cleaning LLC v. North Ridge Constr. Inc.*, 2022 UT App 109, ¶ 52, 518 P.3d 164 ("A provision for payment of attorney fees in a contract includes attorney fees incurred by the prevailing party on appeal as well as at trial, if the action is brought to enforce the contract." (quotation simplified)).

As discussed above, Globe has prevailed on the portions of this appeal relating to the contract and to the damages award. Globe is therefore entitled to an award of attorney fees it incurred in those portions of this appeal. But in Parts III and IV, we have reversed the court's decisions relating to prejudgment interest and the fairly substantial costs and attorney fee awards. It's unclear whether the district court will award a similar costs award on remand, and additional proceedings may result in some change to the attorney fee award as well. In light of these reversals, we conclude that Globe is not entitled to an award of appellate fees relating to those issues. *See, e.g.*, *Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 103, 516 P.3d 306 ("Because the Kraus Parties were awarded attorney fees below but prevailed only in part on appeal, they are entitled to only those appellate attorney fees associated with the issues on which they have prevailed. We remand for the district court to calculate those reasonable fees."); *Macris v. Sevea Int'l, Inc.*, 2013 UT App 176, ¶ 53, 307 P.3d 625 ("We therefore award Macris partial attorney fees on appeal. Because Macris prevailed only in part on appeal, we remand to the trial court for a determination of the appropriate

(continued…)

CONCLUSION

¶90     We affirm the district court's conclusion that Hour breached the contract, including the covenant of good faith and fair dealing, as well as the court's award of damages. We vacate the court's awards of prejudgment interest, costs, and attorney fees to Globe, and we remand for further proceedings on these issues that are consistent with this opinion.

_____

amount of attorney fees and costs incurred with respect to the issues on which he was successful on the appeal."). On remand, the district court should accordingly award Globe only the attorney fees that it reasonably incurred in the portions of the appeal on which it prevailed.